FILED IN OPEN COURT
7/30/2019

CLERK, U S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 3:14-cr-73-J-34JRK

JUAN LUIS HERNANDEZ RILL

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Maria Chapa Lopez, United States Attorney for the Middle District of Florida, and the defendant, Juan Luis Hernandez Rill, and the attorneys for the defendant, Jeff Quisenberry and Francisco Fernandez, Fernandez Law Group, mutually agree as follows:

## A.   **Particularized Terms**

1. **Count(s) Pleading To**

The defendant shall enter a plea of guilty to Count One of the Indictment. Count One charges the defendant with Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code, Sections 1349 and 1343.

2. **Maximum Penalties**

Count One carries a maximum sentence of up to 20 years of imprisonment, a fine of $250,000 or twice the gross gain or loss generated

Defendant's Initials  JH                              AF BB

from the fraud (or both the terms of imprisonment and the fine), a term of supervised release of up to 3 years, and a special assessment of $100 per felony count. If the defendant violates supervised release, the defendant could be sentenced to a maximum sentence of 2 years of imprisonment and an additional term of supervised release.

With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense(s), and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense(s), or to the community, as set forth below.

3. Elements of the Offense(s)

The defendant acknowledges understanding the nature and elements of the offense(s) with which defendant has been charged and to which defendant is pleading guilty.

The elements of Count One are:

First:    Two or more persons, in some way or manner, agreed to try to accomplish a common and unlawful plan to commit wire fraud, as charged in the indictment; and

Second:   The Defendant knew the unlawful purpose of the plan and willfully joined in it.

Defendant's Initials __JH__          2

4. <u>Counts Dismissed</u>

At the time of sentencing, the remaining counts against the Defendant, Counts Ten and Eleven, will be dismissed pursuant to Fed. R. Crim. P. 11(c)(1)(A).

5. <u>Chapter Two Base Offense Level Stipulation</u>

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States and the defendant agree to jointly recommend to the Court that the defendant's Chapter Two base offense level be calculated at 7 pursuant to USSG § 2B1.1(a)(1). The parties understand that such a joint recommendation is not binding on the Court, and if not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

6. <u>Chapter Two Loss Calculation – USSG Section 2B1.1(b)(1)(H)</u>

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States, based on the information available to it, estimates that the defendant will receive a 16-level increase pursuant to USSG § 2B1.1(b)(1)(I) due to the loss exceeding $1,500,000. The parties understand that such an estimate is not binding on the Court, and if the Court calculates the loss differently, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

7. Acceptance of Responsibility - Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.4., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the United States, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

### 8. Cooperation - Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require.  If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policies of the United States, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG § 5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both.  If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policies of the United States, warranting the filing of a motion for a reduction of sentence within one year of the imposition of

sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been provided or what type of motion related thereto will be filed, if any, rests solely with the United States, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9. Use of Information - Section 1B1.8

Pursuant to USSG § 1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG § 1B1.8(b).

10. Cooperation - Responsibilities of Parties

a.      The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.   It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)   The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)   The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and

Defendant's Initials __JH__          7

further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)    The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)    The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)    The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant

case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

11. Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Section 981(a)()(C) and Title 28, United States code, Section 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees. The assets to be forfeited specifically include, but are not limited to, the $1,063,685.93 in proceeds the defendant admits he obtained, as the result of the commission of the offense(s) to which the defendant is pleading guilty. The defendant acknowledges and agrees that: (1) the defendant obtained this amount as a result of the commission of the offense(s), and (2) as a result of the acts and omissions of the defendant, the proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the

defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offense(s) of conviction. The defendant further consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offense(s). The defendant agrees that forfeiture of substitute assets as authorized herein shall not be deemed an alteration of the defendant's sentence.

The defendant also agrees to waive all constitutional, statutory, and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the

defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all substitute assets and to transfer custody of such assets to the United States before the defendant's sentencing.  To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets.  The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States.  The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to any substitute assets before the defendant's sentencing.  In addition to providing full and complete information about substitute assets, these steps include, but are not limited to,

Defendant's Initials __JH__                    11

the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement.  The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

**B.**   **Standard Terms and Conditions**

1. Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement.  The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013.  To ensure that this obligation is satisfied, the Defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $100, payable to "Clerk, U.S.

Defendant's Initials ___JH___                    13

District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

2. Supervised Release

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3. Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen will be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4. Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to

make any recommendations it deems appropriate regarding the disposition of

this case, subject to any limitations set forth herein, if any.

5. Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii),

the defendant agrees to complete and submit to the United States within 30

days of execution of this agreement an affidavit reflecting the defendant's

financial condition. The defendant promises that his/her financial statement

and disclosures will be complete, accurate and truthful and will include all

assets in which he/she has any interest or over which the defendant exercises

control, directly or indirectly, including those held by a spouse, dependent,

nominee or other third party. The defendant further agrees to execute any

documents requested by the United States needed to obtain from any third

parties any records of assets owned by the defendant, directly or through a

nominee, and, by the execution of this Plea Agreement, consents to the release

of the defendant's tax returns for the previous five years. The defendant

similarly agrees and authorizes the United States to provide to, and obtain

from, the United States Probation Office, the financial affidavit, any of the

defendant's federal, state, and local tax returns, bank records and any other

financial information concerning the defendant, for the purpose of making any

recommendations to the Court and for collecting any assessments, fines,

Defendant's Initials __JH__          15

restitution, or forfeiture ordered by the Court.  The defendant expressly authorizes the United States to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.  <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement.  The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office.  The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office.  Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement.  The government expressly reserves the right to support and defend any decision that the Court may make

with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.  <u>Defendant's Waiver of Right to Appeal the Sentence</u>

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range <u>as determined by the Court</u> pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.  <u>Scope of Agreement</u>

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although the undersigned

will bring defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9. Filing of Agreement

This agreement shall be presented to the Court in open court, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10. Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront

Defendant's Initials ___JH___                     18

and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11. Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12. Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13. Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 30th day of July 2019.

July 30 2019

_____
Juan Luis Hernandez Rill
Defendant

MARIA CHAPA LOPEZ
United States Attorney

_____
Tysen Duva
Assistant United States Attorney

_____
Jeff Quisenberry
Attorney for Defendant

_____
Francisco Fernandez
Attorney for Defendant

_____
Frank M. Talbot, II
Assistant United States Attorney
Chief, Jacksonville Division

Defendant's Initials  JH                    20

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 3:14-cr-73-J-32JRK

JUAN LUIS HERNANDEZ RILL

## PERSONALIZATION OF ELEMENTS

Count One (Conspiracy to Commit Wire Fraud):

1. Between in or about mid-2009 through in or about early 2010, did you agree to participate with other individuals to try to accomplish a common and unlawful plan to commit fraud, which ultimately involved the use of wire transmissions in interstate commerce (including email and cellular telephone calls)?

2. Did you know the unlawful purpose of the plan and willfully participate or join in it?

Defendant's Initials __JH__            21

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                CASE NO. 3:14-cr-73-J-32JRK

JUAN LUIS HERNANDEZ RILL

FACTUAL BASIS[1]

**Overview**

The scheme to defraud involved coconspirators (including Juan Luis
Hernandez Rill – hereinafter "Hernandez Rill") representing that they could
access and facilitate investments into high yield international investment
markets, which primarily included the leasing of Certificates of Deposits
(Leased CDs).  The Leased CDs  were purportedly secured by a New Zealand
bank named Unistate Savings and Loan (Unistate).   Unistate purportedly
facilitated and secured the high yield investments, such as the Leased CDs.
However, Unistate was merely a shell company incorporated in New Zealand
on June 5, 2008.  Unistate did not perform legitimate banking business.

---

[1] The assigned Assistant United States Attorney prepared the Factual Basis.  It is intended as
a correct version of the facts supporting the offense to which the defendant is pleading guilty,
and as an aid to the Court performing its function pursuant to Rule 11, Federal Rules of
Criminal Procedure.  The Factual Basis is not intended to be a statement of the defendant,
and it does not contain every fact pertinent to the case or all of the defendant's knowledge of
the fraud scheme.

Hernandez Rill was a citizen and resident of Spain and a citizen of Venezuela, who held himself out to be a "Director" of Unistate. Hernandez Rill's name appeared on numerous fake bank documents used during the scheme. Hernandez Rill communicated via email with an individual in the United States named Christopher Jaijairam (a resident of New York), who was the purported Unistate representative in the United States. Jaijairam incorporated CJ Group Services, Inc. in New York to perpetrate the fraud. Jaijairam had no relevant training and experience in investment markets.

### Other Coconspirators

Glen Elliott Smith was a resident of Louisiana, who had no relevant investment training or experience. Smith was affiliated with Cole's Cash Flow Specialties, LLC to facilitate his role in procuring clients in the United States and furthering the Leased CD scheme.

Mitchell Holland was a resident of California. Holland was licensed to conduct Series 3 investment transactions, which permits the holder to sell or solicit orders for registered futures or options on commodities with registered firms. Holland had no other securities or investment related licenses. In February 2009, Holland incorporated Vital Funds, Inc. in Florida as an entity to assist him in facilitating his role in furthering investments into the fictitious high yield investment markets, including Leased CDs.

Warren Rosenfeld was a resident of Texas.  Rosenfeld held no securities related licenses and had no relevant training or experience in investment markets.  Rosenfeld incorporated Aster Capital, Inc. in Texas in February 2008, as an entity to assist him in facilitating his role in furthering fraudulent investment into fictitious high yield investments/securities, including Leased CDs.

Rondell Scott Hedrick was a resident of North Carolina.  Hedrick did not have securities and investment licenses.  He had no relevant raining or experience in international investment markets.  Hedrick used his corporation Hedrick Consulting to facilitate his role in furthering the fraudulent investments into the fictitious high yield investments/securities, including Leased CDs.

Though Hernandez Rill, Jaijairam, Rosenfeld, Holland, Smith, and Hedrick worked together and had their material roles in furthering the investment into the fictitious Leased CDs, these individual never met each other in person.  Their relationship was entirely online and via email and other electronic communications.

### The Market Opportunity Fraud

After the financial lending collapse in the United States in 2008, numerous capital investors were left without access to traditional funding to

finish ongoing capital construction or other projects, or obtain loans for unexpected costs or delays in finishing capital projects. These capital projects often involved tens of millions of dollars. Many such construction projects and investments entirely ceased before completion because banks would not lend money. This left investors with significant financial losses and no equity to recover losses. Many of these investors mistakenly turned to the internet desperately searching for alternative lending sources to finance the balance of these capital construction and other projects.

The internet is where the high yield investment fraud community (including the defendants) awaited such inquiries at that time in the American economy. Investors were desperate for capital to finish projects, and the high yield investment fraud community knew how to market alternative sources of funding (such as Leased CDs) to make them appealing and seem promising to desperate investors. Many of these schemes had the trappings of legitimacy.

### The Leased CDs in the Present Scheme

The Coconspirators made it appear that they were using legitimate contracts from Unistate wherein the investors signed agreements with Hernandez Rill as the Unistate representative. These agreements were emailed among the coconspirators, and sent to the victims via email.

The coconspirators used what appeared to be a legitimate escrow company named Commercial Escrow Services to receive the initial investment from the investors to begin the process of obtaining access to the fictitious leased CDs. The coconspirators made it appear they were using the Depository Trust and Clearing Corporation (D.T.C.C.), a private yet highly regulated entity that operates a clearinghouse that standardizes the post-trade processing of financial transactions for institutions involved in global trading markets. The coconspirators also assigned the Leased CDs Committee on Uniform Securities Identification Procedures (CUSIP) numbers to specifically identify the Leased CD (or purported security). In the legitimate financial world, these CUSIP numbers specifically identify each security. The same CUSIP number cannot identify two different securities.

Information about the legitimacy of the D.T.C.C. and the use of CUSIP numbers as security identifiers was available to the victims of the Leased CD fraud. There were numerous email communications between the coconspirators and the victims about how the D.T.C.C. operated and the assignment of CUSIP numbers to the Leased CDs. The victims did not know each other. The coconspirators made mistakes and, at times, used the same CUSIP number to identify multiple Leased CDs. This could never happen in the legitimate global financial investment world.

Defendant's Initials __JH__                    26

The Leased CD scheme began in approximately June 2009 and ended in early 2010. None of the Leased CDs paid any investment returns. The victim investors wired money (as shown below in one instance $622,500) for access to a Leased CD in the amount of $200,000,000. The coconspirators filling their various roles convinced the victim investor that he would have temporary access to the Leased CD to leverage it in global trading platform as an investment tool, or to "monetize" the Leased CD and turn the temporary access to the Leased CD into cash. When the initial investment was wired to Commercial Escrow Services, through a series of subsequent transactions, the coconspirators essentially split the money and then for a period of 90 days strung along the victims/investors as to issues arising with the Leased CDs, and convinced the victims/investors that they made mistakes during the process that caused them to lose their initial investment. There were different permutations to the scheme, but this was the general nature of it.

### Victim G.Y.S. – Jacksonville, Florida

G.Y.S. was a Jacksonville, Florida businessman in the construction industry. In the fall of 2009, G.Y.S. was having significant financial issues and was searching for a non-traditional investment opportunity with high yield returns to enhance his ability to obtain construction bonds for large public projects. G.Y.S. accessed the internet and found Smith and Holland.

Holland ultimately communicated with G.Y.S. via Vital Funds.  Hernandez

Rill communicated with Jaijairam via email and sent fake Unistate contracts

that set forth how G.Y.S. could lease a $200,000,000 Leased CD with a

specific CUSIP number.  The contracts and agreements were detailed.

Warren Rosenfeld reviewed the Unistate contracts and vouched for their

legitimacy to Holland and Hedrick, which was communicated to G.Y.S.  The

coconspirators (performing their various roles) convinced G.Y.S. that by

wiring $622,500 to Commercial Escrow Services that G.Y.S. could obtain

temporary access to the $200,000,000 Leased CD, which was secured by

Unistate.

In early November 2009, after G.Y.S. communicated with Smith and

Holland, Jaijairam, the purported Unistate representative in the United States,

contacted G.Y.S. at the direction of Hernandez Rill.  Jaijairam emailed

Unistate documents and wiring instructions for G.Y.S. to wire $625,500

(which included a $3,000 processing fee) to Commercial Escrow Services.

Based on the communications from Hernandez Rill to Jaijairam, then from

Jaijairam to G.Y.S., on November 4, 2009, G.Y.S wired the $622,500 from

his CNL bank account in Jacksonville, Florida to Commercial Escrow

Services in California.  Based on representations from Holland and Hedrick,

G.Y.S. understood that he could monetize the CD or obtain capital by

leveraging the CD in specific high yield investment markets, the returns from which after 60 days would be used to pay the additional required $14,000,000 leasing fee.  G.Y.S. was led to believe that he could use the balance of the funds received from the investment to infuse into his capital construction projects.  However, there was no Leased CD, and no real opportunity to monetize or invest it.  The only events that actually occurred after G.Y.S. wired the $622,500 to Commercial Escrow Services are that the coconspirators split the money.

On November 9, 2009, Rosenfeld instructed Commercial Escrow Services to wire $201,431.00 to Vital Funs (Holland), $78,172 to Aster Capital (Rosenfeld), and $339,502 to the Citibank Espana account for Unistate (Hernandez Rill).  On November 12, 2009, Holland wired $131,290 from Vital Funds to Glen Elliott Smith.  The following day, Smith wired $5,500 to Hedrick.  On November 27, 2009, Unistate (Hernandez Rill) wired $108,632.57 to the CJ Group Services (Jaijairam) account.

On December 1, 2009, Holland emailed a fictitious D.T.C.C. screen shot of the purported Leased CD to Hedrick and copied G.Y.S. on the email. Holland obtained the screen shot from Jaijairam, who received it from Hernandez Rill.  The screen shot referenced Hedrick as the beneficiary, as he was supposed to invest the Leased CD on behalf of G.Y.S.  The CUSIP

number on the D.T.C.C. screen shot was fake.  At that point, all of G.Y.S.'s

$622,500 had been disbursed to the coconspirators.

On January 13, 2010, at the direction of Hernandez Rill, Jaijairam

emailed and advised G.Y.S. that G.Y.S. had a 30-day extension from Unistate

to access and use the $200,000,000 Leased CD.  The email was a hoax, as

there was no $200,000,000 Leased CD, so the additional 30 days for access

and use was meaningless.  In addition, after the initial 60-day period, G.Y.S.

began having significant difficulty in reaching Holland and Hedrick (his two

main points of contact).  G.Y.S. never had direct access to Rosenfeld or

Hernandez Rill.  After email communications, on January 18, 2010, Holland

informed G.Y.S. that Unistate (Jaijairam and Hernandez Rill) had agreed to

extend G.Y.S.'s access to use the Leased CD.  Such a representation was fake,

as there was no Leased CD.  As the 90th day expired, on or about February 8,

2010, at Hernandez Rill's instruction, Jaijairam emailed G.Y.S and advised

G.Y.S. that because G.Y.S. did not fulfill his end of the agreement by paying

the 7% fee of $14,000,000 to Unistate, G.Y.S. no longer had access to the

Leased CD.  Four days later, Jaijairam (at the direction of Hernandez Rill via

email) emailed G.Y.S. a "cease and desist" letter threatening legal action.

G.Y.S. never recovered the $625,500.

Defendant's Initials  _JH_               30

## Other Victims of Deals Involving Unistate

### Bentley Equities, LLC

On September 11, 2009, a representative of Bentley Equities, LLC, after receiving false representations from coconspirators, wired $300,000 to Commercial Escrow Services to obtain access to a purported $25,000,000 Leased CD.  On September 16, 2009, Rosenfeld instructed Commercial Escrow Services to wire $79,400 to Vital Funds and $219,000 to another entity named Federated Management.  The following day, Holland wired $22,500 to Aster Capital (Rosenfeld).  Federated Management wired $18,000 to Unistate. The Leased CD was not real, had a fake CUSIP number, and the coconspirators merely split the $300,000.

### J.N. - WCSP Country Club Office Plaza, LLC

J.N. (a resident of Texas) was a principal of WCSP Country Club Office Plaza, LLC, an entity seeking to secure funds to continue a real estate development project.  J.N. was ultimately introduced to Holland, who introduced J.N. to a $4,000,000 Leased CD.  The coconspirators played their similar roles.  Jaijairam communicated (via Hernandez Rill) to Holland. Rosenfeld remained in the background reviewing and revising the various Leased CD documents that Unistate (Hernandez Rill) prepared and sent. Based on the false representations and promises, on September 25 and 28,

2009, J.N. wired payments from an attorney trust account of $250,000 (9/25/2009) and $125,000 from another business account (9/28/2009) to Commercial Escrow Services.

On October 1, 2009, from those funds, Rosenfeld instructed Commercial Escrow Services to wire $168,394 to Unistate, and $204,756 to Aster Capital. The following day, Aster Capital wired $80,169 to Vital Funds. On October 8, 2009, Unistate (Hernandez Rill) wired $21,391.50 to CJ Group Services (Jaijairam). The $4,000,000 Leased CD was not real. The coconspirators simply stole and split WCSP Country Club Office Plaza, LLC's and J.N.'s money.

### Progressive Funding Solutions, LLC

On October 8, 2009, after communicating with Vital Funds (Holland) about a $50,000,000 Leased CD, a representative of Progressive Funding Solutions, LLC authorized the company's attorney to wire $447,000 from the attorney's trust account to Commercial Escrow Services. On October 15, 2009, from those funds, Rosenfeld instructed Commercial Escrow Services to wire $171,130 to Unistate, $119,688 to Aster Capital, and $154,232 to Vital Funds. On October 26, 2009, Unistate (Hernandez Rill) wired $21,733.50 from the Citibank Espana account to CJ Group Services, Inc. (Jaijairam). The

$50,000,000 Leased CD was not real.  The coconspirators simply stole and split Progressive Funding Solutions, LLC's money.

### Alpha, LLC

R.S. (a resident of Oregon) was a principal of Alpha, LLC, a real estate development company.  R.S. (via Alpha, LLC) purchased an old golf course driving range and had intentions of getting the property re-zoned for commercial/residential construction.  Before R.S. was able to secure additional funding for the project, the real estate market crashed, which (like G.Y.S. and others) led R.S. to research alternative funding mechanisms.  R.S. came across Vital Funds and contacted Holland.  Holland told an employee of R.S. that for $400,000, Alpha, LLC could have access to a $100,000,000 Leased CD, which could be used to show that R.S. had a high net worth asset, which would cause more traditional lenders to be willing to lend money to Alpha, LLC.

Based on Holland's false representations and the same or similar Unistate agreements concerning the $100,000,000 Leased CD, on November 17, 2009, an attorney for Alpha, LLC and R.S. wired $400,000 to Commercial Escrow Services.  On November 19, 2009, at Rosenfeld's instruction, Commercial Escrow Services wired $172,005 to Unistate, $113,097 to Aster Capital, and $113,098 to Vital Funds.  On November 27, 2009, Unistate

(Hernandez Rill) wired $43,527 to CJ Group Services (Jaijairam). The $100,000,000 Leased CD was not real. The coconspirators simply stole and split Alpha, LLC's money.

### RLK Investments Associates and B.W.

B.W. (a resident of New York) was attempting to secure lending to start a computer business. B.W. placed an advertisement on Craigslist regarding funding and was contacted by Smith and another individual. The duo convinced B.W. to invest in a $100,000,000 Leased CD. When it became clear that B.W. intended to invest, Holland became involved. Holland introduced B.W. to Hedrick, who Holland represented could monetize the Leased CD and provide access to cash. Based on the false and fraudulent representations of Smith, Holland, and Hedrick, and the same or similar fake Unistate documents, on November 17, 2009, B.W. wired $300,000 to Commercial Escrow Services. From those funds, on November 19, 2009, at Rosenfeld's instruction, Commercial Escrow Services wired $172,005 to the Citibank Espana account for Unistate, $92,647 to Aster Capital, and $32,648 to Vital Funds. The $100,000,000 Leased CD was not real. The coconspirators simply stole and split B.W.'s money.

## Aurora Asset Management, LLC

Aurora Asset Management, LLC (Aurora) was a Texas corporation. The main principal is deceased. However, an attorney involved representing Aurora and the principal is available and previously testified that Aurora was seeking funding to finish a capital project. Aurora learned about and inquired with Vital Funds (Holland) concerning a $100,000,000 Leased CD. Ultimately, after researching the transaction, Aurora's counsel advised heavily against Aurora participating in the Leased CD deal.

Nevertheless, on December 30, 2009, the Aurora principal instructed Aurora's counsel to wire $450,000 to Commercial Escrow Services. On January 4, 2010, at Rosenfeld's instruction, Commercial Escrow Services wired $165,669 to the Citibank Espana account for Unistate, $131,890 to Aster Capital, and $149,391 to Vital Funds. On January 12, 2010, Unistate (Hernandez Rill) wired $21,000 to CJ Group Services (Jaijairam). The $100,000,000 Leased CD was not real. The coconspirators simply stole and split Aurora's money.

In the seven purported Leased CD transactions involving Unistate, the victims collectively wired $2,897,500 to Commercial Escrow Services. The victims did not recover any of those funds.

Defendant's Initials ___JH___          35

## Juan Luis Hernandez Rill – Social Media and Online Accounts

Juan Luis Hernandez Rill traveled to the United States from Spain in April 2009 and July 2010. At the time of entry, Hernandez Rill provided biographical and contact information, including an email address. Screen captures of Tradekey.com list Hernandez Rill as the Director of Unistate and provides contact information that was included in Unistate documents provided to victims of the scheme. The same screen captures contain the address of Unistate as 412 Lake Road Takapuna, Auckland New Zealand, with the same contact information for Hernandez Rill as the Unistate documents. Hernandez Rill's social media accounts also had multiple references of Hernandez Rill being involved with Unistate and another entity based in the United Kingdom that referenced the same "Secretary" and "Director" who purportedly signed certain Unitstate documents that Hernandez Rill provided to Jaijairam. Jaijairam, in turn, provided those documents to G.Y.S and other victims of the scheme.

Defendant's Initials ___JH___                36